# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KENDALE J. BRINSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 08 C 2420 |
| VERLISHER SYAS, C. BLAYDES, TANYA PATTON, GENE ALEXANDER, TERRENCE WILLIAMS, ROBERT PET, MARTHA DICARO, THOMAS DART, Sheriff of Cook County, COOK COUNTY, ILLINOIS and CITY OF CHICAGO, | ) ) Honorable Charles R. Norgle ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court are cross-motions for summary judgment. Plaintiff Kendale J. Brinson ("Brinson"), a federal postal worker, initiated this case against several Chicago Police Officers ("Officers"), the City of Chicago ("City") and Cook County, claiming that the Defendants violated his constitutional rights when the Officers arrested him on an outstanding warrant for an individual that looked nothing like Brinson but used Brinson's name as an alias. Brinson moved for summary judgment on Count I of his claims, and the Officers moved for summary judgment on all claims. For the following reasons, Brinson's motion for summary judgment is granted, and the Officers' motion is denied in part and granted in part.

### I. BACKGROUND

**A. FACTS**

The Court takes the following facts from the parties' Local Rule 56.1 Statements and the evidence submitted in support thereof. Brinson and the Officers have presented two contrasting accounts of the underlying events. The Court shall summarize them in succession.

## *1. THE OFFICERS' ACCOUNT[1]*

On April 29, 2009 Chicago Police Officers Verlisher Syas ("Officer Syas") and Curtis Blaydes ("Officer Blaydes") pulled over Brinson's vehicle at 4819 S. Ashland Avenue in Chicago. The details of the stop, from the officers' point of view, are somewhat obscure. Officer Syas testified that at some point between 5:00 p.m. and 7:00 p.m. the officers stopped Brinson while he was driving southbound on Ashland Avenue for "a minor traffic violation." Syas Dep. at 29. Officer Syas couldn't recall whether it was a moving violation, an equipment violation or some other type of violation that justified the stop. Id. The Officers, who failed to make any notations as to what Brinson was doing prior to the stop, characterized it simply as "a minor traffic violation." As to any other details regarding the stop, Officer Syas couldn't recall whether or not he was driving the police vehicle; he couldn't remember what kind of car Brinson was driving; he couldn't recall the approximate distance between the two vehicles prior to the stop; and he couldn't recall the duration of the stop. Id. at 29-30, 85.

Officer Blaydes' testimony was equally sparse. When asked what drew his attention to Brinson's car, he couldn't remember. He also couldn't recall what kind of car Brinson was driving. Id. at 32. Officer Blaydes did say, though, that the Officers *probably* initiated their lights and sirens, id. at 36, and eventually stopped Brinson for "a traffic violation." Id. Even still, he couldn't remember whether Brinson's "traffic violation" was a moving violation or an equipment violation, and he couldn't state anything that Brinson may or may not have done that violated the law prior to the stop. Id. at 34.

---

[1] This account is based on the testimony of the arresting Officers, Officer Blaydes and Officer Syas, and the documents presented at the Officers' depositions. There is no dispute that four other Officers (Timothy J. Gaskin, Michael Cochran, Kristin M. Raica and Jill M. Campeglia) were on the scene at some point during the underlying stop, but when deposed those Officers could not recall any details regarding the stop, nor could they recall any details regarding Brinson, his identification, the underlying warrant and the arrest. Their testimony, for the most part, was inconsequential, but relevant insofar as none of these Officers could state any specific reasons as to why the Officers initially stopped Brinson's vehicle.

2

After the stop, the Officers approached Brinson's vehicle. At this point, Officer Syas testified that he had a conversation with Brinson, but he couldn't remember the details of that conversation. In fact, when asked whether he "remember[ed] anything at all about [his] conversation with Mr. Brinson right after [he] stopped [his] car," Officer Syas answered, "No, ma'am." Syas Dep. at 39. Officer Syas couldn't remember whether he or his partner asked Brinson for his identification, and he couldn't recall whether Brinson showed them any form of identification at all. Id. at 40. Officer Syas admitted, however, that if an individual had not produced a driver's license, the Officers would have given that individual a ticket. Id. at 43. There is no dispute that Brinson did not receive a ticket on the day of the stop. Id. at 29-30.

When testifying to similar questions, Officer Blaydes testified that the Officers approached Brinson's vehicle on foot, Blaydes Dep. at 38, but he couldn't say what side of the car he approached, whether he had a conversation with Brinson or whether he asked Brinson for his driver's license. Id. at 39. And, like his partner, Blaydes couldn't remember whether Brinson produced any form of identification. Id. at 41. Later in the deposition, Blaydes admitted that the officers, at an unspecified time, directed Brinson to get out of his car. Id. at 86. Blaydes couldn't say whether at that point he searched the glove compartment, looked under the seats or searched the trunk of Brinson's car. Id. at 86-87. All of that, he said, was "possible." Id. Either way, he testified that he didn't remove any items from Brinson's car, nor did he give Brinson a ticket. Id. at 54.

After the officers' initial encounter with Brinson, one of the officers conducted a name check, or an "event query," using the computer inside the police vehicle. Although the officers couldn't remember who conducted the query, both agreed that it notified the Officers that an Illinois State Police warrant existed for an individual named "Jerry Talley." Syas Dep. at 62; Blaydes Dep. at 63; see Def.'s Appendix, Ex. K, Event Query. And, according to the warrant,

3

Jerry Talley was born in May 1963, was 5'09" tall and weighed 160 pounds. Syas Dep. at 63. Syas admitted that he recalled seeing that the warrant listed Jerry Talley as 160 pounds. Id. at 68. According to Brinson's driver's license, which neither Officer remembers seeing, but which one of the Officers used to conduct the event query, Brinson was born in 1966, was 6'5" tall and weighed 198 pounds. Pl.'s 56.1 Statement, Ex. H. Officer Syas testified that these types of discrepancies are not uncommon, although this particular discrepancy – the 8" height difference – was "significant." See Syas Dep. at 94-95.

Notwithstanding the physical discrepancies between Brinson and Jerry Talley, the warrant listed the name "Kendale J. Brinson" as one of Jerry Talley's aliases. When the Officers spoke to Brinson about the alias, Brinson told the Officers that he was not Jerry Talley. Id. at 70. Indeed, Officer Blaydes admitted that the Officers did not investigate the discrepancies between Brinson and Jerry Talley, and he later testified that Brinson told the Officers at the scene of the arrest that they had the wrong person. Blaydes Dep. at 78. In the end, based on the alias listed on the Illinois State Police warrant, the Officers decided to arrest Brinson and "take him in" for further investigation. Syas Dep. at 72; Blaydes Dep. at 66. The incident narrative in Brinson's arrest report states simply that the Officers curbed his vehicle for a "minor traffic violation" and that a name check revealed an active warrant. Def.'s 56.1 Ans., Ex. G. The report lists Brinson's height as 6'05" and his weight at 103 pounds, which the Officers admitted was an error. Id.

At the police station, while Brinson was in custody, Officer Blaydes verified the warrant. Blaydes Dep. at 70. To do so, he obtained a LEADS printout, which listed various information regarding Jerry Talley's warrant, as well as the following line at the bottom of the page: "ALIAS LDS/W9704768 AKA / BRINSON, KENDALE J." Pl.'s Rule 56.1 Statement, Ex. M. Using this printout, Officer Blaydes contacted the Officer who works at what the parties call the

LEADS desk, Tanya Patton ("Officer Patton"), although he couldn't recall the details of that conversation. Blaydes Dep. at 72-73. He testified that he could have told Officer Patton that he had Jerry Talley in custody, or he could have told her that he had Kendale Brinson. Id. at 73. Aside from whatever name he gave, Officer Blaydes testified that he gave Officer Patton the warrant number. Id. Other than that, he couldn't remember what questions Officer Patton asked; he couldn't remember whether he gave Officer Patton additional information; he couldn't remember whether he discussed with Officer Patton the differences in the height and weight between Brinson and Jerry Talley; and he couldn't remember whether he discussed with Officer Patton the possibility that the Officers had the wrong person in custody. Id. at 73-74.

Based on whatever information Officer Blaydes shared with the LEADS desk, the Officers issued a "Hold Affidavit" for Brinson, which, according to Officer Blaydes, "means to hold this guy into custody until [the agency that issued the warrant] can pick him up because there was no local charges." Id. at 93. The Hold Affidavit includes a space in which the Officers are asked to identify and describe the person on the warrant, but the Officers in this case, for some unstated reason, excluded among other things any information regarding the suspects' height and weight. Pl.'s Rule 56.1 Statement, Ex. L.

### 2. Brinson's Account

Brinson's testimony regarding his arrest provides more detail. At the outset, he testified that on multiple occasions he was subject to prior arrests based on the warrant for Jerry Talley. Brinson Dep. at 30-32, 36-37. This time, he said, three Officers riding together pulled him over as he was driving northbound on Ashland Avenue. Id. at 37. The officers exited their vehicle, approached the car and, after Brinson asked what he did wrong, told Brinson not to ask questions and to step out of his car. Id. at 38. At that point one of the officers got into Brinson's car, looked around, commented that he had a nice radio, asked whether the car belonged to him and

requested his driver's license and insurance. Id. at 38-39. Brinson gave the Officers his license and insurance. Id. at 39.

Brinson testified that one of the Officers went back to the squad car and, when he returned, asked Brinson whether he knew there was a warrant for his arrest. Id. Brinson responded with a question of his own – he asked the Officer whether he reviewed the physical description of the person listed in the warrant. Id. Brinson then told the Officers that he knew about the warrant and that, based on the description, the person listed in the warrant was clearly not him. Id. After that, Brinson testified that he compared his height with that of one of the other Officers, who was approximately 6'1", and explained that the person in the warrant was "five foot something" and thus there was no possible match. Id.

Brinson next handed the Officers two forms of federal identification, a postal identification and a military identification,[2] which, according to Brinson, one cannot obtain with a criminal record. Id. at 39, 43. At that point one of the Officers[3] went back to the squad car, returned to the scene and told the other Officers that Brinson did not meet the warrant's description and thus they could let him go. Id. at 40. But, according to Brinson, another Officer disagreed and stated that they'll "take him in anyway." Id. With that, Brinson testified:

> And at this point I'm flustered, 'cause I'm thinking what the hell. You clearly have an officer here that sees that I'm not the person you're looking for, and he made that statement. But you're going to put me in cuffs anyway[?]
>
> So he put me in cuffs. Put me in the back of the car, and that's when the female said, well, you lucky you cooperated, and I'm thinking to myself[,] lucky? I didn't do anything. I wanted to know why I was stopped. There was no traffic. No ticket. There was nothing.

---

[2] Brinson testified that he was a sergeant and "fought for this country," but he failed to specify the details of his service, such as the branch of the armed forces with which he served. Brinson Dep. at 48.

[3] The parties identified this third Officer as Timothy Gaskin. At his deposition, however, Officer Gaskin couldn't provide any meaningful testimony because he couldn't recall any details about the stop, the arrest or any statements he may or may not have made during the Officers' brief investigation. See Def.'s Joint Answer to Pl.'s 56.1 Statement, Ex. C, Gaskin Dep.

Id. At the station, Brinson was fingerprinted and placed in a cell with two other individuals. He spent the night in jail and, eventually, certain individuals that the parties identified as "Sheriff's Deputies" took Brinson to see "the judge," who appeared on a small television screen. Id. at 80. According to Brinson, he was not given an opportunity to speak, as the judge simply said, "Kendale Brinson, obstruction - - you know: Obstruction, fights police, $10,000..." Id. at 79. Brinson's family paid his bail.

### B. PROCEDURAL HISTORY

On April 28, 2008 Brinson filed a six-count complaint against the Officers, the City of Chicago and Cook County. The next day he filed a first amended complaint, alleging two *Monell* claims, one against the City of Chicago and one against Cook County, and claims against the Officers individually for an unconstitutional traffic stop (Count I), false arrest (Count II), an unconstitutional search of Brinson's vehicle (Count III), illegal detention (Count IV) and a violation of Due Process (Count V). Brinson eventually dismissed his *Monell* claims against the City and Cook County, leaving only the individual Officers as Defendants.

On November 16, 2009 the Officers moved for summary judgment on Counts I through V. That same day, Brinson moved for summary judgment on Count I. On July 19, 2010 Brinson filed an amended motion for summary judgment "to make it clear that plaintiff is seeking relief in the form of partial summary judgment on Count I of the Amended Complaint on the issue of liability only" and not damages. Pl.'s Am. Mot. at 1. The motions are fully briefed and before the Court.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is permissible when "there is no genuine issue as to any material fact and... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The

nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch., 278 F.3d 693, 699 (7th Cir. 2002). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. & Med. Ctr, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Servs. Co., 391 U.S. 253, 280 (1968); Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. UNCONSTITUTIONAL STOP

In support of his motion for summary judgment, Brinson argues that the Officers' initial traffic stop was unconstitutional as a matter of law because the Officers had no probable cause to stop Brinson's vehicle. To determine whether probable cause existed to justify the initial stop, the Court turns to the following standards. It is well-settled that police may stop a car when they have probable cause to believe that the driver has violated any traffic law. See U.S. v. McDonald, 453 F.3d 958, 960 (7th Cir. 2006). Police, in fact, may conduct brief investigatory

8

traffic stops if they have "a reasonable suspicion based on articulable facts that a crime is about to be or has been committed." Id. Both of these standards are evaluated on the basis of what a reasonable person in the officer's position would have perceived. Kelley v. Myler, 149 F.3d 641, 646 (7th Cir. 1998). "[S]o long as the circumstances confronting the police officer support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver." U.S. v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000). There is no question that a stop can be reasonable even if the individual did not actually commit an offense, so long as the officer reasonably believed an offense occurred. McDonald, 453 F.3d at 960. But a stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not objectively reasonable. U.S. v. Dowthard, 500 F.3d 567, 569 (7th Cir. 2007); McDonald, 453 F.3d at 961-62.

In response to Brinson's motion, the Officers' primary contention is that they pulled over Brinson for "a minor traffic violation," which, they say, is enough to justify a brief, investigatory traffic stop. Indeed the Officers made it very clear at their depositions and in the arrest report that they stopped Brinson because they believed he committed a "minor traffic violation." The problem, however, is that the Officers couldn't recount the circumstances surrounding the "minor traffic violation" that Brinson apparently committed.

Recall that the Officers couldn't remember how Brinson was driving, and they couldn't state what traffic law he broke, or what traffic law they believed he broke. For the Officers, it was a mere "traffic violation," and no further details exist to determine what actually occurred and what the Officers reasonably believed. To illustrate this point, the Court observes the following colloquy taken from Officer Syas' deposition, which is largely representative of the Officers' failure to communicate any details regarding the stop:

Q. Why did you pull Kendale Brinson over?

9

A. It was a minor traffic violation.

Q. What was it?

A. I don't recall.

Q. Was it a moving violation?

A. It could have been.

Q. Was it [an] equipment violation?

A. It could have been.

Q. Did you make any notations at all as to what that violation was?

A. No, ma'am.

Q. Did you ever give Kendale Brinson a ticket for that violation?

A. No, ma'am.

. . .

Q. What drew your attention to [Brinson's] vehicle?

A. Whatever the minor traffic violation was.

Q. And you don't recall what that was?

A. No, ma'am.

Q. What kind of car was he driving?

A. I don't recall.

. . .

Q. Tell me all the violations of law that Mr. Brinson was involved in that gave you probable cause to pull over his car?

A. I don't recall.

Q. Do you recall any violations at all?

A. I don't recall.

Syas Dep. at 29-30, 44-45. It's unclear how this type of testimony can allow a fact-finder to draw any inferences with respect to the reasonableness of the Officers' belief that a law had been broken prior to the stop. Faced with this testimony, a reasonable juror would have no idea what the circumstances of the stop were. And, in turn, that same juror would have no idea what prompted the Officers' decision. Brinson testified that he had done nothing wrong. The Officers, on the other hand, said nothing at all, except that some unspecified "minor traffic violation" took place.

In the cases that this Court has examined, and in every case that the Officers cited[4] in support of their position, there is at least some modestly colorable reason why the officers in those cases decided to conduct a traffic stop. That reason either came from the parties' direct testimony, or it came from some other source of evidence.[5] McDonald, 453 F.3d at 961-62 (stop made because officer believed that proceeding on the same street after engaging a turn signal was a violation of Illinois law); U.S. v. Cashman, 216 F.3d 582, 586-87 (7th Cir. 2000) (officer observed plaintiff's cracked windshield, a violation of the Wisconsin Administrative Code); U.S. v. Green, 111 F.3d 515, 518 (7th Cir. 1997) (car stopped to ascertain whether subject of a newly-obtained warrant was present in the vehicle); U.S. v. Quinones-Sandoval, 943 F.2d 771, 773 (7th Cir. 1991) (trooper observed plaintiff run over the left and right hand fog lanes of the highway); Wallace v. Ochoa, No. 09 C 4215, 2010 WL 2330367, at *1 (N.D. Ill. June 9, 2010) (officer testified that he observed driver's left shoulder and did not see her wearing a safety belt); Schor

---

[4] The Officers rely on Sheik-Abdi v. McClellan, 37 F.3d 1240, 1246 (7th Cir. 1994), but the case has no comparative value. While Sheik-Abdi discusses generally the concepts underlying probable cause, it considers the validity of a warrantless entry of a home based on exigent circumstances. It did not involve a traffic stop.

[5] The Court recognizes that a colorable reason does not have to appear in the officers' direct testimony, but it must come from some other source of evidence. For example, in Rainey v. Vill. of Lynwood, the officer there could not recall why he pulled over the plaintiff, but the record contained other evidence from which it became clear that the officer told plaintiff that he pulled him over because his rental car was overdue. No. 09 C 1334, 2010 WL 2403035, at *2-*3 (N.D. Ill. June 9, 2010). The record in this case is void of such other, meaningful evidence.

v. Daley, 563 F. Supp. 2d 893, 899 (N.D. Ill. 2008) (officers observed plaintiff driving while using a mobile phone, against city ordinance). In this case, beyond the Officers' statement that an unspecified "traffic violation" occurred, there is nothing from which a reasonable jury could infer probable cause. As it is, the inference that Brinson committed a traffic violation, whatever that may or may not have been, has no support in the record. Whitwell v. Hoyt, No. 04 C 0981, 2006 WL 469634, at *3 (W.D. Wis. Feb. 27, 2006) (denying defendants' motion for summary judgment because defendants could not offer "any individualized, articulable facts . . . that justified [the officer's] decision to stop plaintiff's vehicle"). Accordingly, Brinson's motion for summary judgment on liability is granted as to Count I.

## C. PROBABLE CAUSE TO ARREST, SEARCH AND DETAIN

Despite the Court's finding that the initial traffic stop was unjustified, the Officers discovered an intervening fact – the warrant – that requires the Court to determine whether probable cause existed for Brinson's subsequent arrest. See Rivera v. Burke, No. 06 C 0734, 2008 WL 345612, at *5 (N.D. Ill. Feb. 7, 2008) ("a lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant") (citing Townes v. City of New York, 176 F.3d 138, 149 (2d Cir. 1999)). The Court shall address the constitutionality of the search of Brinson's vehicle and his detention incident to the arrest after this initial inquiry.

The Officers contend that probable cause existed for the arrest because the event query produced a valid warrant for an individual that used Brinson's full name as an alias. Brinson argues, however, that based on the significant physical discrepancies between him and the individual listed in the warrant, it was unreasonable for the Officers to arrest him, despite the alias listed in the warrant. The analysis, then, turns on the following question – was it reasonable

for the Officers' to believe that the person they arrested, Brinson, was the person listed in the valid warrant, Jerry Talley? To answer this question, the Court turns to the following standards.

An arrest generally is constitutional if the arresting officers: (1) have probable cause to arrest the person sought; and (2) reasonably believe that the person arrested is the person sought. U.S. v. Marshall, 79 F.3d 68, 69 (7th Cir. 1996). While many formulations for probable cause exist, all of them refer to the exercise of judgment, which hinges "on the assessment of probabilities in particular factual contexts." Maxwell v. Indianapolis, 998 F.3d 431, 434 (7th Cir. 1993) (citing Ill. v. Gates, 462 U.S. 213, 232 (1983)). Hence, the touchtone of reasonableness under the Fourth Amendment is sufficient probability, not certainty. Hill v. Cal., 401 U.S. 797, 802 (1971).

In the context of a valid warrant, the arrest of a person named in the warrant, even if it turns out to be the wrong person, will not violate the Fourth Amendment unless the arresting officer acted unreasonably. White v. Olig, 56 F.3d 817, 819 (7th Cir. 1995). "When an individual shares the same name as a person named in a warrant, discrepancies between the warrant and the individual's physical appearance, address, and birth date are, generally speaking, insufficient to create a genuine factual dispute about whether arresting officers had probable cause." Wallace, 2010 WL 2330367, at *4 (citing Tibbs v. City of Chi., 469 F.3d 661, 664 (7th Cir. 2006)). The Court notes that this last statement does not reflect an unwavering rule, as a proper issue for the jury may exist if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. See Llaguno v. Mingey, 763 F.2d 1560, 1565 (7th Cir. 1985).

Here, the Officers encountered an individual with the same name as an alias listed in a warrant for another individual. Both individuals were African-American males and were roughly the same age. The crucial discrepancy, however, is the substantial physical difference

13

between the two. Brinson was a full eight inches taller than Jerry Talley and weighed over forty pounds more. As the Seventh Circuit observed in Maxwell, "[w]hile weight is a mutable characteristic, the size of the difference here should have given the police officers pause." 998 F.2d at 435 (affirming the denial of summary judgment where the person arrested was six inches taller than the suspect). This case presents more than a trivial difference between a birth date or a name; it presents a significant difference between an unusually large individual and a fairly average one. Officer Syas himself testified that an eight-inch height difference was "significant," despite the recurrence of discrepancies in warrants. See Syas Dep. at 94-95.

Moreover, it is noteworthy that Brinson did not have the same name as the person listed in the warrant, as the Officers suggest. Brinson's name was merely one of Jerry Talley's aliases; it was not the primary name. Not only that, but Brinson testified that after he insisted he was not Jerry Talley, Officer Timothy Gaskin went back to the squad car and, when he returned, suggested to the other Officers that they let Brinson go because they did not have the right person. Brinson, according to his testimony, was rather shocked when Officer Blaydes ignored this suggestion. This testimony, coupled with the significant physical discrepancies, the name of the alias and the Officers' failure to investigate further, is enough to undermine the reasonableness of the Officers' decision to arrest Brinson. This is not to say conclusively that the Officers acted unreasonably. The Court merely finds that Brinson has put forth enough evidence to create a triable issue as to the reasonableness of the Officers' decision to make an arrest. Accordingly, the Court denies the Officers' motion for summary judgment on Count II.[6]

---

[6] The Officers in passing argue that probable cause existed to arrest Brinson based on his "traffic infractions." But these infractions are entirely unsubstantiated. There is nothing in the record to show that Brinson broke the law, that he was driving with a suspended license or that the Officers believed he was driving with a suspended license. Brinson points out that the event query that indicates a suspended license was printed over two years *after* Brinson's arrest. The Officers testified that they had never seen the event query. In short, it is irrelevant. The attempt to use this event query as credible evidence of a "traffic infraction" that justified the arrest is nonsensical.

As to the search of Brinson's vehicle, the Officers assert that if they had probable cause to arrest Brinson, then they in turn were permitted to search his vehicle incident to the arrest. Def.'s Resp. at 8-9. They conclude that Brinson was under arrest pursuant to a valid arrest warrant, and thus the search was lawful. But the Officers' logic is not unyielding, because the "search incident to arrest" exception is foreclosed by the United States Supreme Court's holding in Arizona v. Gant, 129 S. Ct. 1710 (2009). There the Supreme Court limited the exception and held that officers may not conduct "a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle" unless they have reason to believe that the vehicle may contain evidence of the crime for which the arrest occurred. Gant, 129 S. Ct. at 1714. The Officers in this case have offered no evidence to show that they had reason to believe that Brinson's vehicle contained, or could have contained, evidence relevant to the reason for which they arrested Brinson. Furthermore, the Court explained previously that regardless of whether a valid arrest warrant exists, a question of fact remains as to whether the Officers reasonably believed that they were arresting the right person. Accordingly, summary judgment for the Officers' search of Brinson's vehicle is denied.

Finally, as to Brinson's detention, the analysis is similar to that with respect to the search of Brinson's vehicle. The Officers once again argue that they are entitled to summary judgment because they had probable cause for Brinson's arrest, "and therefore he can be detained." Def.'s Resp. at 9. But whether probable cause existed as to Brinson's arrest is still at issue. Even if the Court examined the search and detention independently from Brinson's arrest, there are no intervening incidents in the record to justify either one. For example, there is nothing to show that the Officers saw contraband in plain view in Brinson's vehicle, or that Brinson failed to provide the Officers with proof of automobile insurance. This, in the very least, would provide an independent justification for the Officers to arrest Brinson. Moreover, there is no evidence

15

that the Officers made any effort to investigate the discrepancies between Brinson and Jerry Talley, even after they arrived at the station. Brinson's lengthy detention (28 hours) merits some explanation. See generally Arlott v. Bradley Ctr., 349 F.3d 517, 523 (7th Cir. 2003) (noting that a four-hour post-arrest detention required an explanation). And since a question remains as to whether the arrest was valid, there is no factual basis for summary judgment as to the Officers' subsequent conduct. Accordingly, summary judgment is denied with respect to Brinson's illegal detention claim in Count IV.

### D. OFFICERS' REMAINING ARGUMENTS

The Officers argue next that they are entitled to summary judgment because not all of them were personally involved in the alleged Constitutional violations. Initially, Brinson agrees that Officers Pet and Patton were not personally involved in the underlying incidents, and thus summary judgment is granted as to those Defendants. See, e.g., Swanigan v. Trotter, 645 F. Supp. 2d 656, 678 (N.D. Ill. 2009) (granting summary judgment in favor of officers that had no personal involvement in the underlying search and seizure). As to Officers Syas and Blaydes, the Court agrees with Brinson that they were personally involved in the underlying arrest, search and detention, and thus summary judgment is denied as to those Officers. A question remains, however, as to the Officers that Brinson encountered at the police station.

As to Officer Alexander, the Officers state that he "worked at the district to prepare and process the necessary documents to ensure Plaintiff's transfer to Cook County jail." Def.'s Resp. at 10. According to Officer Alexander's deposition, he prepared Brinson's Intrastate Hold Affidavit, which sets forth the information in the out-of-county warrant, or in this instance the Illinois State Police warrant. Officer Alexander testified that when he completed the Intrastate Hold Affidavit, he mistakenly failed to enter either Brinson or Jerry Talley's height and weight. He also failed to include either Brinson or Jerry Talley's "IR Number," the internal record

number associated with one's fingerprints. Finally, Officer Alexander failed to mark any boxes on the Intrastate Hold Affidavit that indicate the Officers' "means of identification," which could be a comparison of the individuals' descriptions, a fingerprint comparison or an admission by the person in custody. In the end, Officer Alexander included on the Affidavit only those descriptors that Brinson and Jerry Talley had in common – race, eye color, hair color and sex. Based on these omissions, a reasonable juror could infer that Officer Alexander was involved in Brinson's alleged illegal detention. Summary judgment is therefore denied as to Officer Alexander.

Finally, as to Officer Williams, he served as the Watch Commander and approved probable cause to fingerprint and detain Brinson. He also failed to release Brinson after his fingerprints cleared the system. Accordingly, since it is plausible that a comparison between Brinson and Jerry Talley's fingerprints could have proven that the Officers arrested the wrong individual, an inference exists that Brinson's continued detention was unconstitutional because of Officer Williams' conduct. Summary judgment is denied as to Officer Williams.

The Officers, as their final argument, contend that they are entitled to summary judgment because of qualified immunity. The Court disagrees. The Supreme Court has established a two-part test for qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." Wheeler v. Lawson, 539 F.3d 629, 639 (7th Cir. 2008) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). Here, because the Court previously found that Brinson has presented evidence of an unconstitutional stop, search, arrest and detention, the focus of our inquiry is on the second prong of the test above, which turns on whether the Officers' conduct was reasonable. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

17

The Court has already found that a question exists as to whether the Officers acted unreasonably with respect to the traffic stop, the arrest and detention. And as to the search of Brinson's vehicle, it seems to have happened prior to Brinson's arrest, without any evidence that the search was justified. Moreover, the search occurred at a time after the Officers pulled over Brinson for an unstated "minor traffic violation," and there is no evidence to suggest that the search had anything to do with either that violation or with some other criminal activity. Based on this evidence, a reasonable jury could conclude that the Officers violated Brinson's "clearly established" rights to be free from searches and arrests that are not supported by probable cause. See Hughes v. City of Chi., 673 F. Supp. 2d 641, 647 (N.D. Ill. 2009) (denying summary judgment on similar arguments) (citing U.S. v. Ross, 456 U.S. 798, 809 (1982)). The Officers are not entitled to summary judgment on qualified immunity grounds.

### III. CONCLUSION

For the reasons stated above, Plaintiff Kendale Brinson's motion for summary judgment is granted. The Officers' motion for summary judgment is granted in its entirety as to Officers Pet and Patton. The Officers' motion for summary judgment is denied as to all Counts as to the remaining Officers.

IT IS SO ORDERED.

ENTER:

*Charles Norgle*

CHARLES R. NORGLE, Judge
United States District Court

DATED: 8/4/10